UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHRISTIAN RYDER
c/o International Regulatory Law Group
1629 K Street, N.W., Suite 300
Washington, D.C. 20006,

Civil Action No.

              *Plaintiffs,*

   vs.

UNITED STATES DEPARTMENT OF
THE INTERIOR
1849 C Street, N.W.
Washington, D.C. 20240,

U.S. FISH AND WILDLIFE SERVICE
1849 C Street, N.W.
Washington, D.C. 20240,

DAVID BERNHARDT, in his official
capacity as the Secretary of the U.S.
Department of the Interior,
1849 C Street, N.W.
Washington, D.C. 20240, and

MARGARET EVERSON, in her official
capacity as the Principal Deputy Director
Exercising the Authority of the Director of
U.S. Fish and Wildlife Service,
1849 C Street, N.W.
Washington, D.C. 20240,

              *Defendants.*

## COMPLAINT FOR DECLARATORY JUDGMENT

1.      Plaintiff, Christian Ryder, challenges the U.S. Fish and Wildlife Service's

("FWS") complete inaction/inactivity regarding a new Captive-Bred Wildlife Registration

(CBW) permit application that was filed with the Department of Interior, U.S. Fish and Wildlife

Service, under the U.S. Endangered Species Act (ESA) (hereinafter referred to as "Defendants") on or about August 22, 2019.

2. The lawfully submitted permit application was filed with the Defendants in excess of nine months ago.

3. This Complaint for Declaratory Judgment identifies specific action and specific inaction by the Federal Defendants.

4. At all times after the codified allotted timeframe Federal Defendants had under Title 50, C.F.R.17.3 the Federal Defendants to issue or deny the permit application, the federal defendants caused injury to Plaintiff by the agency's failure to issue the lawfully sought permit.

5. This declaratory judgment action brought, under 28 U.S.C. § 2201, for the *de facto* denial by the Federal Defendants of the Plaintiff's permit application seeks a declaration and determination that the Federal Defendants violated the Endangered Species Act by their failure to issue the applied for CBW permit.

6. The Federal Defendants violated 50 C.F.R. 17.3, *et seq.,* by their collective failure to take any action on Plaintiff's permit application.

7. At all times, Plaintiff was in complete and material compliance with the Endangered Species Act 16 U.S.C. § 1531, (a)(c)(d) and 50 C.F.R. 17.3 (and all applicable subsections).

## JURISDICTION AND VENUE

8. This Court has federal question jurisdiction over the case pursuant to 28 U.S.C. § 1331.

9.      This Court may grant the relief requested under 28 U.S.C. §§ 2201-2202 (declaratory judgment) and 5 U.S.C. §§ 701-706 (Administrative Procedure Act: judicial review of final agency action and inaction), and 16 U.S.C. § 1540(g) (ESA's 'citizen suit provision').

10.     Venue is proper in this judicial district (District of Columbia) pursuant to 28 U.S.C. § 1391(e).

11.     This Court has subject matter jurisdiction of the Endangered Species Act 16 U.S.C. § 1531, (a)(c)(d).

12.     The judicial review provisions of APA and ESA waive the Federal government's sovereign immunity preclusion, 5 U.S.C. § 702, 16 U.S.C. § 1540(g).

13.     This Court has personal jurisdiction over the federal agency defendants.

## PARTIES

14.     Plaintiff, Christian Ryder, in an individual citizen with approximately five decades of experience owning, raising, propagating and maintaining reptiles.  *See* Exhibit A (Captive-Bred Wildlife Registration (CBW) permit application that was filed with the Department of Interior, U.S. Fish and Wildlife Service, under the U.S. Endangered Species Act (ESA) (hereinafter referred to as "Defendants") on or about August 22, 2019). Plaintiff is an aggrieved and injured party.

15.     Defendant, United States Department of Interior, is a department of the United States government.

16.     Defendant, U.S. Fish and Wildlife Service, is one of nine independent agencies that operate under the United States Department of Interior.

17.     Defendant, David Bernhardt, is presently the Secretary of the Interior and in said capacity is responsible for rulings issued by any agency under the Department of Interior.

18.     Defendant, Margaret Everson, is the Principal Deputy Director Exercising the Authority of the Director of U.S. Fish and Wildlife Service. Defendant, Margaret Everson has direct managerial oversight over the employees of U.S. Fish and Wildlife Service.

## FACTS

19.     Plaintiff filed a validly complete new application for registration under the Captive Bred Wildlife program. Tile 50 C.F.R. 17.3

20.     Plaintiff has previously filed actions against the United States Department of the Interior and the U.S. Fish and Wildlife Service to enforce his citizen suit rights as they are stated under Title 50 and within the Endangered Species Act. See more specifically *Phoenix Herpetological Society, Inc. v. United States Fish and Wildlife Service,* Civil Action No. 1:19-cv-00788 (APM) (D.D.C.); *Phoenix Herpetological Society, Inc. v. United States Fish and Wildlife Service,* Civil Action No. 1:17-cv-02584 (APM) (D.D.C.) and *Ryder v. U.S. Department of the Interior*, Civil Action No. 1:15-cv-01576 (RCR) (D.D.C.). The 2017 suit is presently before the District Court awaiting a ruling on competing motions for summary judgment while the 2019 action as it pertains to the claim of "cyclical mooting" is in the process of being amended by way of plaintiff filing an Amended Complaint. The 2015 suit was 'Settled by Full Compliance" and subsequently withdrawn by dismissal on the plaintiff's part.

21.     On or about August 22, 2019, Plaintiff's new application was filed with Defendants. It is the newest application that was filed during August, 2019, that is the subject of the instant action. The application exceeds the detail criteria required to obtain a CBW permit. The application provided thorough, accurate, and complete data and information that would have allowed the Federal Defendants to make the sensible decision to approve the CBW permit. *See* Exhibit A appended hereto.

22.     Plaintiff's application was accompanied by the required permit application fee which has been processed by the Federal Defendants.

23.     On the date the instant suit was filed, the Federal Defendants have not responded to Plaintiff's application that had been submitted in good faith and such permit application was so thoroughly complete as to be beyond enhancement or embellishment.

24.     Under the District of Washington D.C. (D.D.C.) precedent and by the Administrative Procedure Act, an application filed with a federal agency that has been ignored, or the agency has failed to make any ruling or take any 'action' upon the application after 180-days is deemed denied (by the agency). After more than nine months, the Federal Defendants have failed to grant, deny or request additional material facts. The Federal Defendants' silence is a denial under the law.

25.     Federal Defendants disseminated by listing in the Federal Register the proposed guidelines and timeframes applicants that seek the Rule 10 exemption for the Rule 9 proscription of 50 C.F.R. 17.3.

26.     Federal Defendants authored, then printed and distributed a 'manual' or '*handbook"* similarly titled "selling" or "administering" the CBW product, whose author, Michael Carpenter, was then-senior biologist who produced the manual or handbook.

27.     The manual or handbook, as well as directives enumerated on the Federal Defendants' application forms and website, clearly determine that *"up to 90 days"* is required to properly review, administer and produce the CBW permit.

28.     Federal Defendants currently promulgate to the public the anticipated processing period to expect (by the applicant) for CBW registration. The public notification reads in material part:

To apply for the captive-bred wildlife registration, applicants must complete application form 3-200-41 and submit it along with the processing fee to the Service's Division of Management Authority. Applicants should allow approximately 90-days to process and review an application. This review process includes a 30-day comment period to receive public comments[1]

29.     The Federal Defendants have unlawfully, capriciously, and arbitrarily denied Plaintiff's application.  *See* Exhibit A.

### Statutory Framework and Facts Giving Rise to Plaintiffs' Claim for Relief

### Endangered Species Act

30.     Section 9 of the ESA makes is unlawful to '*deliver, receive, carry, transport, or ship in interstate commerce ... in the course of a commercial activity "*any endangered species 16 U.S.C. § 1538 (a).

31.     These prohibitions apply to endangered animals bred in captivity, as well as to those in the wild, unless a lawful section 10 permit has been issued by the FWS.

32.     Section 10(a)(1)(A) of the ESA authorizes the FWS to issue a "permit"[3] for any act that is otherwise prohibited by section 9, but only if such act is "for scientific purposes **or** to enhance the propagation **or** survival of the affected species" *id.* § 1539(a)(1)(A).

33.     The FWS may grant exceptions under section 10(a) "Only if (it) finds and publishes … in the Federal Register that (1) such exceptions were applied for in good faith, (2) if granted and exercised will not operate to the disadvantage of such endangered species, and, (3) will be consistent with the purposes and policy [of the] Act", *Id.* § 1539(d).

---

[1]     Accessed on March 19, 2019 https://www.fws.gov/international/pdf/factsheet-captive-bred-wildlife-and-endangered-species-act.pdf.

[3]     FWS has organizationally referred to licenses and permits in the ambit of 'Permits', although as here with the instant case the Plaintiff was issued a FWS Import Export Permit, some document authority issued by FWS says 'permit' and others say 'license'. FWS refers to these as *permits*.

34.     The purposes of the ESA "are to provide a means whereby the ecosystems upon which endangered (or threatened) species depend may be conserved, to provide a program for the conservation of such endangered and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section "16 U.S.C. § 1531(b). No provision of the ESA authorizes the Federal Defendants to engage in activities that discourage or hinder conservation or result in harm to the conservation of species. Defendants have taken steps to obfuscate Plaintiff's procedural entitlement to permits and licenses for which it is qualified. ESA does not tolerate indiscriminate permit authorization, and it absolutely does not permit granting permits and approvals under CBW Registration protocols and Endangered Species Act rules, to other applicants that are under-qualified or not qualified at all, which as here, these federal Defendants have engaged in such arbitrary approval granting. These federal Defendants contrary to myriad federal rules have tolerated, allowed, and in many regard; *fostered* a pay-for-play scheme where agency outsiders have been allowed unfettered access to the permitting process; all but guaranteeing approvals inside normal processing times to persons, entities and non-juridical beings wholly unqualified to possess these permits, approvals or authorities from the United States Fish and Wildlife Service.

### The Administrative Procedures Act

35.     The APA provides for judicial review of final agency action by persons "aggrieved" by the action. 5 U.S.C. § 702. The APA legally renders "inaction" (by the agency) as a denial after the sixth month of inactivity (on the application before the agency).  Inaction or the failure to act upon the Plaintiff's application violates the Endangered Species Act and the Administrative Procedures Act.

36.     Plaintiff is 'aggrieved' and suffered injury by FWS DMA's random and wanton disregard of 50 C.F.R. 17.3 and 16 U.S.C. § 1531.  The *de facto* denial has recklessly interfered with international breeding and propagation programs Plaintiff described in Item 10 of his filed CBW permit application.  *See* Exhibit A.  Secondly, The APA imposes upon reviewing courts duties, including the requirements to:

1.     Compel agency action unlawfully withheld or unreasonably delayed, and

2.     Hold unlawful and set aside agency action, findings, and conclusions to be found to be—

A)     Arbitrary, Capricious, an abuse of discretion or otherwise not in accordance with law…. 5. U.S.C. § 706.

37.     The judicial review provisions of APA and ESA waive the Federal government's sovereign immunity, 5 U.S.C. § 702, 16 U.S.C. § 1540(g)

38.     The *de facto* denial contravenes the precise obligations undertaken by the United States government, as signatory to the Convention on Trade (CITES)[4] and the Administrative Procedure Act, 7 U.S.C. § 706(2)(a), (c), (d) wherein the ('Admin. Proc. Act') specifically proscribes arbitrariness, capriciousness. In the instant case FWS has arbitrarily ignored Plaintiff's August 2019 application .

39.     No provision of the ESA authorizes the Federal Defendants to engage in activities that discourage or hinder conservation or result in harm to the conservation of species. By simply 'ignoring' Plaintiff's application, the Federal Defendants are negatively impacting the covered species listed on the application, *i.e.,* Grand Cayman Blue Iguana, *Cyclura Lewisi.* . By

---

[4]          https://www.cites.org/

using this unlawful *de facto* denial *technique*, the Federal Defendants prohibit Plaintiff from furthering the conservation of the species identified in the application.

40.     Conduct by the Federal Defendants as described in paragraphs set forth in this complaint constitutes an abuse of discretion, an abuse of authority, and otherwise not in accordance with the operative law that has been legislated in the Endangered Species Act or the statutory framework articulated in the relevant section under Title 50.

41.     As stated above, in the prior identified actions, the claim presented in this action is being repeated yet for another time by the Federal Defendants against Plaintiff or an entity of which Plaintiff is closely affiliated.   In this action, the Federal Defendants have continued to engage in a persistent pattern or course of conduct that involves inaction and/or *de facto* denial until such time as Plaintiff files suit to coerce and compel the Federal Defendants to perform their statutory and regulatory mandated duties and responsibilities.  It is this action by the Federal Defendants that commenced post filing of suit, that forms the thinly-veiled attempt to deprive this court of jurisdiction by mooting Plaintiff's claims by engaging in 11th hour compliance.

## CAUSES OF ACTION

## COUNT ONE

**(Violations of the APA and ESA:**
**Federal Defendants Erroneously Denied Plaintiffs' Application)**

42.     Plaintiff realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs of this Complaint as though they were set forth verbatim herein.

43.     Federal Defendants acted arbitrarily and capriciously in denying Plaintiff's new permit application.  Federal Defendants have arbitrarily and capriciously denied Plaintiff's new permit application, through institutional inaction.

44.     The Federal Defendants violated 5 U.S.C.S. § 706(2)(A), (C).

## COUNT TWO

**(Violations of the APA and ESA: Federal Defendants
Failed to Enforce ESA and then violated A.P.A. by the Failure to
Administer Plaintiff's Application Review)**

45.     Plaintiff realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs of this Complaint as though they were set forth verbatim herein.

46.     Federal Defendants acted arbitrarily and capriciously and contrary to law by failing to even consider the new application filed by Plaintiff, on or about August 22, 2019, for a CBW registration certificate. This inaction violates A.P.A. 5 U.S.C. § 702, *et seq.*

## COUNT THREE

**(Violations of the APA and ESA: Federal Defendants
Failed to Administer ESA properly in violation of ESA and APA)**

47.     Plaintiff realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs of this Complaint as though they were set forth verbatim herein.

48.     The federal Defendants have exhibited in the case at bar a callous disregard to the Endangered Species Act 16 U.S.C. §. § 1539, *et seq.* All Federal Defendants have failed in the proper administration to ESA as Congress legislated it. All the of the Federal Defendants knew their duty under ESA to issue the registration certificate when Plaintiff sought a section 10 exemption to the section 9 prohibition. These Federal Defendants abrogated

Plaintiff's standing under ESA and by doing so they all violated ESA 16 U.S.C. § 1539 *et seq.* By violating ESA, these Federal Defendants violated the Administrative Procedures Act 5 U.S.C. § 702- 706, *et. seq.*

### Prayer for Relief

For the reasons stated above, Plaintiff respectfully requests that the Court grant the following relief:

1) Declare that the Federal Defendants violated the ESA and the APA in denying the Plaintiff CBW amended registration as required under 50 C.F.R. 17-3 *et al.*

2) Declare that these Federal Defendants violated Endangered Species Act 16 U.S.C. § 1531, (a)(c)(d) and by doing so, violated the obligations of the United States Government under CITES. The Convention on International Trade in Endangered Species of Wild Fauna and Flora.

3) Immediately issue Declaratory Judgment commanding FWS to issue Plaintiff's CBW registration certificate.

4) Award the Plaintiff all costs associated with this litigation including but not limited to court costs and fees, printing, mailing, serving, and all costs determinatively related to the senseless round of unneeded agency appeals, including travel costs and accumulated legal costs.

Dated: June 2, 2020                        Respectfully submitted,

LAW OFFICES OF FREDERICK COLES, III

/s/      Frederick Coles, III

By: _____

Frederick Coles, III, Bar No. 434896
4802 South 1110 East
Salt Lake City, Utah 84117
Tel. No. 908.757.4977

E-Mail:  FColes@coleslegal.com
Attorneys for Plaintiff, Christian Ryder

**EXHIBIT A**

Form 3-200-41



OMB Control No. 1018-0093
Expires 08/31/2020

## Department of Interior
## U.S. Fish and Wildlife Service
# Federal Fish and Wildlife Permit Application Form

U.S. Fish and Wildlife Service
Division of Management Authority
Branch of Permits, MS: IA
5275 Leesburg Pike
Falls Church, VA 22041-3803
1-800-358-2104 or 703-358-2104

Type of Activity

**CAPTIVE-BRED WILDLIFE REGISTRATION (CBW) under the U.S. Endangered Species Act (ESA)**

Complete Sections A or B, and C, D, and E of this application. U.S. address may be required in Section C, see instructions for details.
Instructions on how to make your application complete and help avoid unnecessary delays are attached.

### Section A: Complete if applying as an individual

| 1.a. Last Name | 1.b. First Name | 1.c. Middle Name/Initial | 1.d. Suffix |
|---|---|---|---|
| Ryder | Christian | | |

| 2. Date of Birth (mm/dd/yyyy) | 3. Telephone Number | 3.a. Alternate Telephone Number | 4. E-mail address |
|---|---|---|---|
| | | | |

### Section B: Complete if applying on behalf of a business, corporation, public agency, Tribe, or institution

| 1.a. Name of business, agency, Tribe, or institution | | 1.b. Doing business as (DBA) | |
|---|---|---|---|
| | | | |

| 2. Tax identification no. | | 3. Description of business, agency, Tribe, or institution | |
|---|---|---|---|
| | | | |

| 4.a. Principal officer Last name | 4.b. Principal officer First Name | 4.c. Principal officer Middle name/initial | 4.d. Suffix |
|---|---|---|---|
| | | | |

| 5. Principal officer title | | 6. Primary contact name | |
|---|---|---|---|
| | | | |

| 7.a. Business telephone number | 7.b. Alternate telephone number | 7.c. Business fax number | 7.d. Business e-mail address |
|---|---|---|---|
| | | | |

### Section C: All applicants complete address information

| | | | 1.f. Country |
|---|---|---|---|
| | | | USA |

| 2.a. Mailing address (include if different than physical address; include name of contact person if applicable) | | | |
|---|---|---|---|
| c/o International Regulatory Law Group. L.P. 1629 K Street N.W. Suite 300 | | | |

| 2.b. City | 2.c. State | 2.d. Zip code/Postal code | 2.e. County/Province | 2.f. Country |
|---|---|---|---|---|
| Washington DC | Dist of Columbia | 20006 | DC District | USA |

### Section D: All applicants MUST complete

1. Attach the **nonrefundable application processing fee** in the form of a check or money order payable to the U.S. FISH AND WILDLIFE SERVICE **in the amount of $200.** Federal, Tribal, State, and local government agencies, and those acting on behalf of such agencies, are exempt from the processing fee – *attach documentation of fee exempt status as outlined in instructions* [50 CFR 13.11(d)].

2. Certification: I hereby certify that I have read and am familiar with the regulations contained in *Title 50 Part 13 of the Code of Federal Regulations* and the other *applicable parts in subchapter B of Chapter I of Title 50*, and I certify that the information submitted in this application for a permit is complete and accurate to the best of my knowledge and belief. I understand that any false statement herein may subject me to the criminal penalties of 18 U.S.C. 1001.

| Signature of applicant/Principal Officer for permit (No photocopied or stamped signatures) | Date of signature (mm/dd/yyyy) |
|---|---|
| | 08/14/2019 |

**Please continue to next page**

Form 3-200-41

OMB Control No. 1018-0093
Expires 08/31/2020

## E. CAPTIVE-BRED WILDLIFE REGISTRATION (U.S. Endangered Species Act)

Please use the following application for all CBW requests: new or renewals.

☒ This is a new application.

☐ This is an amendment or renewal application.

All applicants must complete **Part 1** of the application. A CBW Registration remains valid for five years and may be renewed once for a total validity of ten years, after which the CBW Registration number will be retired and you must apply for a new CBW Registration. If a renewal application is submitted thirty days or more prior to the expiration of the CBW Registration, the applicant may continue to conduct previously authorized activities during the renewal process. However, if the application is submitted fewer than thirty days prior to expiration, activities must cease at the time the registration expires until the renewal process is completed.

**For new applications and amendments**, complete **Part 2** of the application. You may renew your CBW once after 5 years, but after a CBW registration has been valid for 10 years, you must submit a complete new application responding to all questions.

**To renew your CBW** (it has been less than 10 years since you submitted a completely new application), complete **Part 3** of this application.

Electronic submission of inventories, photographs, and receipts: Some applications contain extensive inventories and /or a large number of photographs or receipts. You may provide electronic versions of the documents. Such a submission will assist the processing of your application since it may reduce data entry by the U.S. Fish and Wildlife Service. If you wish to provide information electronically, once you have received an application number via the e-mailed acknowledgment letter, e-mail your information to permits@fws.gov. Be sure to include the application number provided in the acknowledgment e-mail that will be sent to you when we receive your application.

☐ I will be submitting documents electronically.


**Part 1: All Applicants Should Complete:**

The Division of Management Authority annually distributes a list of Captive-Bred Wildlife (CBW) Registration permittees to all CBW registration holders. The list facilitates the exchange of parental stock among registered breeders and includes permittees that operate as individuals, as well as those that are business entities. For businesses and other organizations holding CBW registrations, including sole proprietorships, the list includes name, permit number, address, and species held by each permittee. However, the records for individuals holding CBW registrations are contained in a Privacy Act (5 U.S.C. 552a) system of records. Therefore, only the name, species, permit number, and state of residence will automatically be included on the list. The complete address will be included only upon authorization from the individual permittees. NOT AUTHORIZED

Form 3-200-41

OMB Control No. 1018-0093
Expires 08/31/2020

*If you are **not** a business or organizational entity, and are applying for the CBW registration as an individual, please provide **one** of the following statements (**Note:** if you collect funds for any wildlife purpose, you are a business):*

I, [your name] of [facility name] authorize the U.S. Fish and Wildlife Service to include my complete address in its CBW registration list and to release this information to other CBW holders or the public, if requested. I would also like the Service to use the following address on the CBW registration list: [indicate either your mailing address or facility address as identified in your application].

☐ Same address as on page one.

☒ Different address:  Christian Ryder
International Regulatory Law Group
1629 K Street, NW. Suite 300
Washington DC. 20006

Signed _____  Date 08/13/19

**OR**

I, [your name] of [facility name] **do not** authorize the U.S. Fish & Wildlife Service to include my complete address in its CBW registration list. Since my contact information will not be made available to parties interested in cooperating with other CBW holders in breeding programs, I intend to use the following method to communicate and facilitate exchanges with other interested CBW holders:

Signed _____  Date _____

1. Name and address where you wish the permit to be mailed, if different from page 1. If you would like expedited shipping, please enclose a self-addressed, pre-paid, computer-generated, courier service airway bill. If unspecified, all documents will be mailed via the U.S. Postal Service.

   Christian Ryder
   International Regulatory Law Group
   1629 K-Street, Suite 300, N.W.
   Washington. D.C 20006

2. Who should we contact if we have questions about the application (name, phone number, and e-mail)?

   ████████████████████████████████████████

3. Disqualification factor. A conviction, or entry of a plea of guilty or nolo contendere, for a felony violation of the Lacey Act, the Migratory Bird Treaty Act, or the Bald and Golden Eagle Protection Act disqualifies any such person from receiving or exercising the privileges of a permit, unless such disqualification has been expressly waived by the Service Director in response to a written petition. (50 CFR 13.21(c)) Have you or any of the owners of the business, if applying as a business, been convicted, or entered a plea of guilty or nolo contendere, forfeited collateral, or are currently under charges for any violations of the laws mentioned above?

   ☒ No  ☐ Yes  NO VIOLATIONS, NO CONVICTIONS, NO SMUGGLING,
   NO ANIMAL CRUELTY FINES OR ARRESTS OR INDICTMENTS. NO LACEY ACT CRIMES,
   NO MURDER OF DEPT OF AGRICULTURE AGENTS, NO SUBORDINATION OF PERJURY,
   NO "SECOND SET OF BOOKS", NO DEAD ANIMALS.

Rev. 8/2017

Page 3 of 8

Form 3-200-41 OMB Control No. 1018-0093 Expires 08/31/2020
Rev. 8/2017 Page 4 of 8

If you answered "Yes" to Question 3, provide: a) the individual's name;
b) date of charge; c) charge(s); d) location of incident; e) court; and f)
action taken for each violation. Please be aware that a "Yes" response
does not automatically disqualify you from getting a permit.

**No violations**

4. Provide copies of any license or registration under the Animal
Welfare Act regulations of the U.S. Department of Agriculture [9
CFR 2] (if required) and/or any State license or registration
required to maintain or breed the species requested in Part 2 or
Part 3 below. If available, provide a copy of your last two (2)
USDA AWA inspection reports.

**I have no permits in my name identified in Question #2**

5. The exact location(s), including address(es), where the wildlife
requested in this application will be maintained. If more than one
location exists, list all that apply (**Note:** You must report any
change in address or location of facilities to the Division of
Management Authority within 10 days).

████████████████████████████████████████████

~~\*\*\*See photo of location~~

6. Provide a current inventory, including those out on loan, for
each of the ESA-listed species you are requesting to include or
have already been approved to hold (if currently holding a valid
CBW registration) on your CBW registration

**Applicant does not presently have any ESA-listed animals,
so none are listed.  This is an application to obtain the**

1

'applied for' species under the Endangered Species Act. To be clear, when the application is approved (or, if the application is denied and I file suit and the Court orders the permit's issuance) I will then have the endangered animals sought to be covered by the application.

7.A description of the qualifications of the individuals who will care for the animals, including the number of years' experience with this species or similar species, and names of current caretakers.

Christian Ryder has fifty years (which is 50% of a century) experience. Starting at 5 years old he had adult boa constrictors and medium size pythons. He has bought, raised, bred and maintained numbers of species of iguanas including
*Iguana.iguana*
*Cyclura carinata*
*Cyclura nubila*
*Cyclura collei*
*Cyclura cychlura*
*Cyclura cornuta*
He has obtained, maintained, propagated, collaboratively interfaced with wildlife specialists, zoologists and herpetologists surrounding the sound, ethical, legal, proper and best practices for reptile husbandry, and in particular iguana and monitor care and propagation.
He has successfully produced colonies of *Morelia Boeleni* ( the Boelens python) and has dispatched Boeleni specimens to professional herpetologists in the U.S. accompanied by a successful propagation package (precise enclosure instructions, use of natural and human produced lighting specifications (needed to brumation)).

2

He has also successfully produced several colony pods of *Apadora Papuana* (another very difficult python to breed in captivity).

He is also a crocodile specialist with advanced ethology experience. He probably understands juvenile and sub-adult crocodile behavior better than any known published author on this topic.

He founded and funded Comoros Crocodile Farm which commenced a propagation endeavor for the species *Crocodylus niloticus* and *Crocodylus rhombifer*. The farm will produce its first clutch in December 2019.

He has worked with giant tortoises *Chelinoidis nigra*.

He also has hands-on care, maintenance and husbandry experience with a range of non-human primates. In fact, he was raised (as a child forward) with non-human primates. Further in fact, his very last non-human primate is buried at Arlington National Cemetery (with his natural father, a World War II navy hero)[1]

Part 2: New Application, Amendment, or Renewal of a CBW which is older than 10 years: FOR EACH SPECIES BEING REQUESTED for inclusion in a registration, whether a new application or amendment, complete each of the following questions. Signify that you have read each question by writing "N/A" if not applicable. If submitting hard copy pages, please indicate the species and the application question number you are addressing.

---

[1] This was done long in advance of being made aware that Arlington Cemetery prohibits burial of animals remains of any kind.

This is a new application

8.The scientific name (genus, species and, if applicable, subspecies) and common name of the species.

Grand Cayman Blue Iguana, *Cyclura Lewisi*

9.The name, address, and CBW registration number of the person(s) or institution(s) from whom you plan to acquire the wildlife. If currently unknown, state if there is an organized breeding program that you are involved with or if you have communicated with other breeding organizations.

It is my intention to obtain progeny from Phoenix Herpetological Society of Scottsdale, Arizona, and their CBW # is MA19818A. The physical address is 28011 N 78th St. Scottsdale, Az. 85266.This institution has a breeding program ongoing which surrounds pre-Act specimens that have been carefully bred and housed and the lineage is distinct.

I have been in constant communication with David Blair for his valuable input regarding propagation difficulties with the species under application here.

He did a field study  of the species on Grand Cayman in August 2007 and again in June 2011.

10.Provide a specific description of how your proposed activities are going to facilitate captive breeding for conservation purposes

of this species, including your long-term goals for your breeding program and intended disposition of any progeny.

## My program description:

It is my plan to propagate a colony of Grand Cayman iguanas. I have over fifty years of reptile and more specifically iguanid experience.

First: Since 'any' propagation of endangered species provably enhances the survival of the species by increasing the number of live specimens, this requirement is met. Every risk-assessment study shows that increasing the *basis* of the species, which is the underlying total number of any given species, the specific species is then more expansive (increase of aggregate population). Expansion of the basis is counted by and interpreted as '*increasing the population*' size (exponential expansion of the basis).

By further example: Some recent studies reveal that the cumulative aggregate of this species in their natural environment *(on Grand Cayman) ( and all within a very, very tight 3.1 mile or 9.603e+6 square yard area) is 1000 (one thousand) live animals.  Prior to re-colonization by specimens from off-site breed colonies hatched in the United States, prove the population was low as " 12 wild animals" with other scientific estimates as 'species extinct".

For those specimens actively wild on Grand Cayman today this means that scientifically; 100% of the 1000 live specimens on Grand Cayman are isolated in an area so small that it can be covered by an average man is less than 44 minutes time (at a walking pace). And these precise geographical coordinates have been proven and ratified by each expert that studies this particular species. The three existing colonies on Grand Cayman are very close together, the iguanas travel between those three sections and there is no natural- or manmade prohibition or intervention that impedes inbreeding of this iguana species (or any other in any location for that matter). All efforts to delineate the three populations from cross mixing has been abandoned years ago. Scientists are in universal agreement that the starter genetic pool had been impossible to segregate because the specimens on Grand Cayman originated from essentially specimens with no genetic differentiation.

Considering the very small natural cohort of the species on Grand Cayman- and the very few live specimens accounted for there, my

breeding program can produce up to 20 new specimens per year. Since I am applying for two females and one male (and contemplating a male that has provably bred already) I can produce up to 40 viable specimens per year. Thus; in three years I would be able to produce 120 specimens which would equal near or about 12% of the total known wild population. Using only the original 1.2 in this simple calculation, in four years I can produce nearly 50% of the total known population in the wild (which would be about 440 new Grand Cayman iguanas. This calculation does not confound for any breeding of the progeny from the original propagation(s) that my program starts with.

**Establishment or Augmentation of Grand Cayman Blue Iguana SSP**
My plan also includes working with other U.S. CBW holders for this species. I also have first-hand knowledge of some original proven specimens that had not been covered by CBW registration (because the owners/keepers never had any interface with interstate commerce, thus they are indemnified from CBW registration requirement(s). I am aware of several stand-alone specimens in zoological collections. I also know that Crutchfield Reptiles (of Florida) has several breeding age, originally lawfully imported Grand Cayman Blue iguanas. Since I work with Crutchfield Reptiles on a regular basis, those particular specimens could be used as an adjunct to my original propagation plan(s) mentioned here. I will work collaboratively with those permit holders to offer 'in-house' breeding loans- meaning exactly that those specimens not in my own possession would then be shipped to me for propagation of the species, which would then produce even more specimens which then adds to the cumulative total of this species on the planet, increasing the basis in general. Moreover, using the stand-alone specimens described above, this will radically increase genetic diversity of the species because I am aware that the specimens I am going to acquire for my "specie saving" propagation program, are unrelated to those specimens that are in other collections.

And from a conservation perspective, breeding this species here, as proposed, ads significantly to the conservation of the species. And unlike in the wild on Grand Cayman where "feral cats, dogs, rats" reduce native population on Grand Cayman by scientifically proven predation, my breeding colony, -and any other propagation program flowing from it means that my specimens will help get jump-started, they will not have the challenges of rat-cat-dog predation. And where

6

science reports that only perhaps one or two hatched wild specimens survive their first year, my experience and enclosure plans will eliminate loss that occurs through natural attrition or contrived attrition by the cat-rat-dog problem on Grand Cayman. As we all know very well, larger full-body, fully developed Grand Cayman iguanas are adept at minimizing the cat-rat predation effect. Adult iguanas of this species have been shown to even repel some dog attacks.

**Return of Sub-Adult Grand Cayman Iguanas to Grand Cayman:** All the evidence shows, and this is shown by the verified statements of officials on Grand Cayman that 'release' of sub-adult progeny into the wild of Grand Cayman has been the single known intervention to stop the decline of endemic specimens on Grand Cayman. Without this intervention there would be no iguanas on Grand Cayman.

My plan would include the establishment of shipments of sub-adult Grand Caymans back to Grand Cayman. The science data reveal that Grand Cayman officials have welcomed and continue to welcome this approach at restocking Grand Cayman with this indigenous species.

**Further Diversification and Alternate Propagation Programs**
By working with several existing known specimens that are held within U.S. zoological collections, by offering each some progeny from my propagation program they are willing to establish sub-colonies which will add to the aggregate cumulative number of specimens. These conservationists will be 'contractually' drawn into the requirement to share their progeny to go back to Grand Cayman as sub-adults. I have working relationships with most AZA Reptile Curators in the United States.

All progeny will be used to repopulate on Grand Cayman. The sole limiting exception will be those progeny used to seed or start propagation programs with the zoological held specimens described above.

**Conserving this Species Through Education and Public Awareness**
I have extensive experience lecturing about reptiles. I've had near or about 9000 students to date attend my lecture series. It is my intent to create a stand-alone lecture series that will

7

cover only the Grand Cayman Iguana. This lecture series will cover the plight of the specimen, education about the specimen and get the students involved with the specimen. Right now- this is critical! The environmental news is afloat with stories of the green iguana (*Iguana. iguana)* that is offensively invading Florida. With the Florida officials' multiple announcement to 'kill every iguana you see' and this is actively covered by main stream media, the public is mistakenly being misinformed. Because at no time do Florida officials (state, county, local) differentiate between Green Iguanas and Blue Iguanas from Grand Cayman.

As is well known from the science, Grand Cayman blue iguanas have the ability to change coloration based on numerous circumstances ( camouflage, mating, fright, food gathering, sun intensity, temperature, age, mood and disposition). With a half million tourists to Grand Cayman annually [2] there is a mixed message: by example; *are iguanas all invasive? Is killing in iguanas Florida a portable idea in the mind of tourists visiting Grand Cayman? If a blue iguana is in its 'green mode' (or green coloration phase) is the message it is fair game for elimination? Is an iguana crossing a highway on Grand Cayman OK to run over the way it is in Florida and Georgia?*

These are troubling issues that can negatively impact wild iguanas on Grand Cayman. Looking at this alternatively, the example is simple: A feral dog in the brush in Florida is not different than a feral dog anywhere else, this applies to Grand Cayman. The same applies to cats, to a greater degree actually.

11. Provide documentation or a complete description showing how your captive population is being managed to maintain its genetic vitality. If you do not currently maintain sufficient specimens of

---

[2] https://tradingeconomics.com/cayman-islands/tourist-arrivals

each species requested to maintain the genetic viability of the species, you must participate in an organized breeding program. Please indicate this program and provide documentation describing the objectives, goals, and current efforts of the program.
.

My plan also includes working with other U.S. CBW holders for this species. I am aware of several stand-alone specimens in zoological collections. I will work collaboratively with those permit holders to offer 'in-house' breeding loans- meaning exactly that those specimens not in my own possession would then be shipped to me for propagation of the species, which would then produce even more specimens which then adds to the cumulative total of this species on the planet. Moreover, using the stand-alone specimens described above, this will increase genetic diversity of the species because I am aware that the specimens I am going to acquire for my "specie saving" propagation program, are unrelated to those specimens that are in other collections.

And from a conservation perspective, breeding this species here, as proposed ads significantly to the conservation of the species. And unlike in the wild on Grand Cayman where "feral cats, dogs, rats" reduce native population on Grand Cayman by scientifically proven predation, my breeding colony, -and any other propagation program my specimens will help get jump-started, will not have the challenges of rat-cat-dog predation. And where science reports that only perhaps one or two hatched wild specimens survive their first year, my experience and enclosure plans will eliminate loss that occurs through natural attrition or contrived attrition by the cat-rat-dog problem on Grand Cayman. As we all know well, larger full-body, fully developed Grand Cayman iguanas are adept at minimizing the cat-rat predation effect. Adult iguanas of this species have been shown to repel some dog attacks.

Return of Sub-Adult Grand Cayman Iguanas to Grand Cayman: All the evidence shows, and this is shown by the verified statements of officials on Grand Cayman that 'release' of sub-adult progeny into the wild of Grand Cayman has been the single known intervention to stop

the decline of endemic specimens on Grand Cayman. Without this intervention there would be no iguanas on Grand Cayman.

My plan would include the establishment of shipments of sub-adult Grand Caymans back to Grand Cayman. All of the science data reveal that Grand Cayman officials have welcomed and continue to welcome this approach at restocking Grand Cayman with this indigenous species.

My notes and research shows that officials on Grand Cayman greatly welcome reintroduction to the island's wild area the release of additional specimens.

12. If your activities include the holding of surplus animals (i.e., no longer needed in the organized breeding program and will no longer be bred) for an organized management program, document how your acquisition of such wildlife will relieve crowding at the locations from which the wildlife will be obtained, and thereby assist the breeding program for the species involved. Provide documentation that you are a participant in an organized breeding program where the holding of surplus wildlife has been identified as a necessary objective of the breeding program. Provide a description of how you will restrict/control breeding at your facility.

There has never been in the history of record keeping of or for the Grand Cayman blue iguana any "overcrowding", there has never been "excess specimens", and since at least as far as males Grand Cayman blue iguanas go, science has dictated they will mate and produce viable progeny to their final day of life. Since specimens have lived in captivity for 70 years according to science, their long lives generally go to the idea they are still viable for propagation. Since the native population is 'challenged' and more specimens are needed where the species is endemic, no situation presents where overcrowding or superfluous stock exists.

13. For each requested species, provide a description of your experience in maintaining and propagating the requested species or similar species, including:

   a. The number of years you or the facility has/have maintained the requested species or similar species.

**I have propagated many species of reptiles. Iguanids are not challenging to propagate with the sole caveat that dominant males are either housed separately- or- each enclosure has room and path for retreat and escape from a dominate male.**

   b. During the past five years, how many (by species, by year) successful births/hatches of each requested species or similar species have occurred at your facility? How many survived beyond 30 days?

   **I have not bred (propagated) the species under application prior to the application. However, I have propagated *iguana.iguana* and *Cyclura.nubila* with measured success. There is no significant difference between or among the species listed here and the species that is under application.**

   c. How many mortalities of requested species or similar species have occurred at your facility during the past five years? What were the causes? What measures have you taken to prevent future mortalities?

**Total morbidity/mortality = 0**

11

**I haven't had any mortalities in the last 5 years so there is no proactive measure to take**

 

    d. A brief resume for all senior animal care staff or personnel that will be working with or maintaining each species requested.

    **Applicant's wildlife resume is attached**

14. Provide a detailed description, including size, construction materials, and protection from the elements, as well as photographs and detailed diagrams (no blueprints, please) clearly depicting your existing facilities, including space for future progeny, where the wildlife will be maintained.

**My enclosures with resemble the attached descriptions.**